# IN THE COURT OF APPEALS OF IOWA

No. 21-1185
Filed January 10, 2024

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**REATH STEPHEN YAK,**
    Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Polk County, Scott J. Beattie, Judge.


        A defendant appeals his convictions for two counts of attempted murder,

intimidation with a dangerous weapon, and willful injury. **AFFIRMED.**



        Martha J. Lucey, State Appellate Defender, and Rachel C. Regenold,

Assistant Appellate Defender, for appellant.

        Brenna Bird, Attorney General, and Louis S. Sloven, Assistant Attorney

General, for appellee.


        Considered by Bower, C.J., and Tabor and Greer, JJ.

**GREER, Judge.**

The State charged five defendants in connection with a drive-by shooting at a Des Moines residence. In a trial severed from his co-defendants, a jury found Reath Yak guilty of intimidation with a dangerous weapon, willful injury causing serious injury, and two counts of attempted murder. On appeal, Yak argues the State presented insufficient evidence to support his convictions. He also contends the district court erred in denying his challenge to the prosecutor's peremptory strike of a Black woman from the jury under *Batson v. Kentucky*, 476 U.S. 79 (1986). We find substantial evidence to support his convictions and affirm the district court's denial of Yak's *Batson* challenge.

## I. Facts and Prior Proceedings.

On March 1, 2021, sixteen-year-old N.M. was babysitting when she slipped outside around 10:40 p.m. to retrieve a phone charger from her mother's car. Inside the house, her nine-year-old brother, B.C., was sleeping and her two-year-old nephew, D.M., was watching cartoons. Moments later, N.M was dodging bullets, thinking "it was going to be my last day living." As the shots rang out, N.M. ducked into the car for shelter. Investigators later found eleven bullets struck the vehicle. Sixteen bullets struck the house. One bullet struck D.M. in the head.

Right before the shooting, N.M. saw a dark-colored sport utility vehicle (SUV) stop on the street in front of her house. The driver's side was closest to the house. Inside were "at least four" males. N.M. did not recognize the occupants, but she later described them as "really dark" skinned. They said "something" to N.M.; she asked: "Who are you?" One responded: "You know who this is." Then the shooting started. Before she ducked into the vehicle, N.M. saw only one

shooter—a Black male wearing a ski mask reaching over the roof from the passenger side.  N.M. heard "at least" thirty gunshots before the SUV sped away.

After the shooting, N.M. returned to the house to check on her brother and nephew.  But extensive damage to the front door prevented her from going back inside.  Panicked, she ran to a neighbor's house to call 911.  When the medics arrived, they found D.M. with a gunshot wound to his head.  They rushed the two-year-old to the children's hospital where he underwent surgery to remove the bullet from his scalp.  D.M. survived, but he now has seizures, needs medication, and is paralyzed in his right hand.

Meanwhile, police canvassed the neighborhood looking for surveillance systems.  They succeeded.  One neighbor's system picked up what sounded like "multiple guns" being fired at a shooting range.  Another camera showed that the "possible suspect vehicle" was a black Nissan Rogue that had circled back around to the house several times.  Des Moines police broadcast that description to other law enforcement agencies.

Just after midnight, a passerby reported a single-car crash on westbound Interstate 80 in Dallas County.  The car was a Nissan Rogue.  It was "disabled up against the center guard wire."  Deputy Nicholas Merwald arrived at the crash scene around 12:30 a.m.  From the frost building up on the windows in the early March chill, he estimated that the SUV had been stranded there at least half an hour. The airbags had deployed, yet none of the five occupants tried to move while speaking to the deputy.  The man in the driver's seat, Thon Bol, said he swerved to avoid hitting a deer.  He said they were waiting on his sister and didn't need any

help. Thon's brother, Owo Bol, was a backseat passenger, along with Odol Othow and Caine Dominguez-Schiesl. Yak sat in the front passenger seat.

After state troopers arrived to assist, Deputy Merwald directed the driver back to his patrol vehicle. Thon Bol had to crawl through the front passenger seat to get out because the driver's door was wedged against the cable barrier. As this was happening, officers noticed a Glock pistol under the driver's seat. That discovery created a "tense situation" as the officers removed the four remaining passengers. During a search of Thon Bol, officers found a black ski mask. During a search of Owo Bol, officers found two more nine-millimeter pistols.[1] They also collected many spent bullet casings from the SUV. Those casings matched casings recovered at N.M.'s residence.

All five occupants were taken to the Des Moines police station to be interviewed. In his interview, Yak—who lived in Storm Lake—confirmed that the Nissan Rogue belonged to his parents. He acknowledged being friends with Owo Bol but denied knowing about the guns found in the SUV. When asked how he knew Bol, Yak just repeated over and over: "I know him." Yak did tell Detective Jeffrey Shannon that the group came to Des Moines to see "family," though he did not disclose whose family. Yak was standoffish during the interview, answering Detective Shannon's questions with a monotone delivery and using as few words as possible. Yet their closing exchange was revealing. As the detective was leaving the room, he accused Yak of driving the group to Des Moines where they "shot a two-year-old boy." Yak claimed: "I never even drove." Detective Shannon

---

[1] The Iowa Division of Criminal Investigation (DCI) later reported that swabs of these guns revealed a mixture of DNA from at least four people.

repeated the accusation, telling Yak the two-year-old was "probably not going to make it." Yak responded: "So that's who came to the door?" Shannon followed up: "What's that?" Yak rephrased: "Who came to the door?" Shannon asked: "What door?" Yak replied: "Never mind."

After those interviews and other evidence gathering, the State charged Yak and his four companions with attempted murder, a class "B" felony, in violation of Iowa Code section 707.11(1) (2021);[2] intimidation with a dangerous weapon with intent, a class "C" felony, in violation of section 708.6; and willful injury causing serious injury, a class "C" felony in violation of section 708.4(1). At a pretrial conference ten days before trial involving all five defendants, a Polk County sheriff's deputy heard Owo Bol say across the courtroom: "Hey, Yak, you better not fucking fold. Don't fucking say shit."

The trial started with all five defendants together. But after jury selection and opening statements, the court severed the prosecutions of Thon Bol, Owo Bol, Dominguez, and Othow.[3] Yak consented to continuing with the selected jury.[4] That jury found Yak guilty as charged. For the intimidation and willful-injury offenses, the jury found that Yak possessed or aided and abetted someone who

---

[2] The State ended up charging two counts of attempted murder: one listing the victims as D.M. and/or B.C. and the other listing the victim as N.M.

[3] That severance was sparked by the opening statement from Dominguez's attorney. She suggested that the motive for the shooting was gang hostility between the victims' family and the other four defendants who were members of a rival Sudanese tribe. The court agreed that separate trials were necessary because Dominguez would be pursuing a "mutually antagonistic defense" from the others charged in the shooting.

[4] As to his *Batson* challenge, no one argues this consent constituted waiver, so we do not consider it. *See State v. Short*, 851 N.W.2d 474, 480 (Iowa 2014) (recognizing an argument is not before the court when neither party raised it).

possessed a dangerous weapon. The district court sentenced Yak to concurrent prison sentences for a total of twenty-five years—with mandatory minimums of seventeen and one-half years on the attempted murder counts and five years on the intimidation and willful injury counts.

Yak appeals, arguing two issues.

## II. Analysis.

## A. Sufficiency of the Evidence.

Yak contests the sufficiency of the State's evidence for all four crimes. We review his challenge for correction of legal error. *See State v. Acevedo*, 705 N.W.2d 1, 3 (Iowa 2005). If substantial evidence supports the verdicts, we will uphold them. *State v. Ramirez*, 895 N.W.2d 884, 890 (Iowa 2017). Evidence is substantial if—when viewed in the light most favorable to the verdicts—it can convince a rational jury that the defendant is guilty beyond a reasonable doubt. *State v. Reed*, 875 N.W.2d 693, 704–05 (Iowa 2016).

### 1. Aiding and Abetting All Four Crimes.

For all four counts, the court instructed the jurors that they could find Yak guilty if he acted either as the principal or as an aider and abettor. On appeal, Yak concedes the jury could have inferred from the State's evidence that he was "likely present in the vehicle at the time of the shooting." But he argues that the State did not prove that he "knowingly approved or agreed to the commission of the crimes or that he encouraged or actively participated." We read Yak's challenge to the State's proof of aiding and abetting as subsuming the theory that he acted as the principal shooter.

The court provided the jury with this definition:

> "Aid and abet" means to knowingly approve and agree to the commission of a crime, either by active participation in it or by knowingly advising or encouraging the act in some way before or when it is committed. Conduct following the crime may be considered only as it may tend to prove the defendant's earlier participation. Mere nearness to, or presence at, the scene of the crime, without more evidence, is not "aiding and abetting." Likewise, mere knowledge of the crime is not enough to prove "aiding and abetting."

Yak emphasizes that the State had to show "something more than mere presence" to prove he aided and abetted the other defendants. He urges that even if he knew what was going on during the shooting, he did not participate in the "planning, execution, and attempted flight from this crime."

But the State can prove aiding and abetting without direct proof of participation. Jurors may infer an accused's participation from "circumstantial evidence such as 'presence, companionship, and conduct before and after the offense.'" *State v. Lewis*, 514 N.W.2d 63, 66 (Iowa 1994) (citation omitted). Since Yak conceded that the jury could infer his presence in the SUV during the shooting, we turn to the idea of companionship. In his interview with police, Yak acknowledged being friends with Owo Bol. Owo Bol too described the group as "all friends"[5] and claimed they came to Des Moines to visit his "auntie." The familiarity among the companions was corroborated by Thon Bol in a recorded

---

[5] And not only were the five friends, but testimony revealed that some were affiliated with a gang called the Trip Set Gang or South Sudanese Soldier. It was Yak's attorney who asked Detective Shannon about the information he received from Omaha detectives that Dominguez and the Bol brothers were "known gang members." Defense counsel followed up: "You didn't have conversations with anybody that Mr. Yak is part of the Trip Set Gang; correct?" The detective replied: "No, that's not correct. . . . Recently I've spoken with one of the detectives over there, and he indicated that they were all familiar with Mr. Reath Yak."

phone conversation with his sister after the crash. She asked Thon who was in the SUV; he identified the other four occupants by name. She seemed to recognize all the names.

All in all, evidence of Yak's companionship with the other four people in the SUV contributes to the aiding-and-abetting inference. Under the State's theory of the case, Yak drove his father's SUV from Storm Lake to Sioux City, where he picked up Othow and the Bol brothers; drove to Omaha, where he picked up Dominguez; and then continued to Des Moines. While Yak would have driven some distance to gather those passengers, Detective Shannon confirmed that the route could be traveled in one day. From the State's evidence, a rational jury could infer that Yak provided transportation to facilitate the shooting.

We next look to Yak's conduct after the shooting. He remained in the front passenger seat after the SUV crashed on the interstate. He refused to talk to the police at the crash scene or to offer much information in his interview. In closing arguments, defense counsel said Yak was "just along for the ride" and was afraid to "snitch" on his companions. But the State countered that once Yak was isolated at the police station, if he really had been surprised by the shooting, it would have made sense for him to disclose that experience when urged to do so by law enforcement. A reasonable jury could have accepted the State's inference that Yak's reluctance to distance himself from the scheme signaled his complicity.

The State also rebutted Yak's along-for-the-ride defense. The prosecutor suggested that Yak was driving at the time of the shooting but switched places with Thon Bol after the crash because Thon had a driver's license and Yak did not. The State supported this theory with evidence that when officers responded to the

crash, Thon was holding the only black ski mask. And N.M. recalled that the shooter wearing a black ski mask was on the passenger side. The State reasoned: "[I]f Thon was the masked shooter, he could not have also been the driver." Viewed in the light most favorable to the State, this circumstantial evidence could support a finding that Yak actively participated in the crimes by driving the SUV at the time of the shooting. *See State v. Turner*, 345 N.W.2d 552, 556 (Iowa Ct. App. 1983) (finding sufficient evidence of aiding and abetting when Turner acted as "getaway" driver). And as the State argues, even if Yak was not the driver, jurors could still have inferred he took part in the shooting. He lent his parents' SUV to the cause. He took notice of a would-be victim who appeared at the door of the house. And DCI testing showed the three guns in the SUV had DNA from four contributors, allowing the jurors to infer that each of the passengers may have handled the weapons. Therefore, we find substantial evidence for the aiding-and-abetting theory, which supports the guilty verdict.

**2. Intent Elements of Attempt to Commit Murder of D.M. and/or B.C., Intimidation with a Dangerous Weapon, and Willful Injury.**

Beyond his general challenge to the State's proof of his participation, Yak contests the specific-intent elements for three of the offenses: the attempted murder charge involving the two boys, intimidation with a dangerous weapon, and willful injury causing serious injury.

To prove Yak guilty of the attempted murder of either boy, the State had to offer substantial evidence for these elements:

> 1. On or about the 1st day of March 2021, [Yak], or someone he aided and abetted, shot firearms into the home of D.M. and/or B.C.

2. By his acts, [Yak], or someone he aided and abetted, expected to set in motion a force or chain of events, which could have caused or resulted in the death of D.M. and/or B.C.

3. When [Yak], or someone he aided and abetted, acted, he specifically intended to cause the death of D.M. and/or B.C.

Yak challenges only the State's proof of specific intent in the third element.

To prove Yak guilty of intimidation with a dangerous weapon, the State had to offer substantial evidence for these elements:

1. On or about the 1st day of March 2021, [Yak], or someone he aided and abetted, shot firearms into a home . . . which was occupied by D.M. and/or B.C.

2. A firearm is a dangerous weapon . . . .

3. D.M. and/or B.C. actually experienced fear of serious injury and their fear was reasonable under the existing circumstances.

4. [Yak], or someone he aided and abetted, shot the dangerous weapon with the specific intent to injure or cause fear or anger in D.M. and/or B.C.

Like the attempted-murder count, Yak challenges only the State's proof of specific intent in the fourth element.

Yak next turns to his conviction for willful injury. The State had to prove these elements:

1. On or about March 1, 2021, [Yak], or someone he aided and abetted, shot firearms into the home . . . .

2. [Yak], or someone he aided and abetted, specifically intended to cause a serious injury to D.M. or any of the occupants of the home . . . .

3. [Yak's] act, or the act of someone he aided and abetted, caused a serious injury to D.M. . . . .

Again, Yak challenges only the proof of specific intent for the second element.

The district court provided the jury with this definition:

"Specific intent" means not only being aware of doing an act and doing it voluntarily, but in addition, doing it with a specific purpose in mind.

Because determining a defendant's specific intent requires you to decide what he was thinking when an act was done, it is

seldom capable of direct proof. Therefore, you should consider the facts and circumstances surrounding the act to determine a defendant's specific intent. You may, but are not required to, conclude a person intends the natural consequences of his acts.

For all three crimes, Yak points to the lack of evidence that he or his co-defendants knew either D.M. or B.C.; knew they were inside the house; or, in fact, knew that anyone was inside the house. Without that knowledge, Yak contends that he could not have intended to cause their deaths, to injure them or cause them fear or anger, or to cause serious injury to D.M.—nor could he have known of his co-defendants' intent to do so.

On the law, Yak argues that this case does not involve transferred intent like *State v. Mong*, 988 N.W.2d 305, 307−08 (Iowa 2023) (upholding conviction for attempted murder when shooter missed intended victim but injured a bystander).[6] Unlike *Mong*, Yak's jury was not instructed that his intent to inflict harm on one victim shifted to another. *See* 988 N.W.2d at 314. The instructions here required the jury to find that Yak "specifically intended to cause the death of D.M. and/or B.C." for the attempted-murder count and had "specific intent to injure or cause fear or anger in D.M. and/or B.C." for the intimidation count. According to Yak, by naming the victims in the marshalling instructions, the State had to prove his intent to harm one or both individuals.

---

[6] States like California that do not apply the doctrine of transferred intent in attempted murder cases have shaped a "kill zone" theory, recognizing that a person's desire to kill a particular target does not preclude finding that the person concurrently intended to kill others in the immediate vicinity. *See People v. Bland*, 48 P.3d 1107, 1118 (Cal. 2002). But that theory has not been addressed in Iowa.

The State agrees with Yak that this is not a case of transferred intent.[7] But it disagrees that it needed to prove that Yak or his companions knew the boys by name or only wanted to harm them, to the exclusion of anyone else in the house. It was enough, in the State's view, that Yak and his companions knew "someone" was inside the house when they fired at least sixteen rounds at the front door. And the State points to evidence from which the jury could infer that knowledge. For example, the State offered surveillance video of the Nissan Rogue circling the house "two or three times" in the five or six minutes before the shooting. Detective Shannon testified the group could have been "making sure they have the right target" or "hoping somebody comes out of the residence."

Beyond that video showing the SUV casing the house, the evidence included Yak's question to the detectives—"who came to the door?"—letting slip that he saw someone inside the house. Granted, the timing of that sighting is unclear. But the jury could fairly infer that Yak saw a child come to the door either before or during the gunfire, because the SUV sped away after the shooting.

Indeed, these circumstances do not make for a neat determination of specific intent. As another jurisdiction observed: "A drive-by shooting is the paradigm problematic attempted murder case." *Richeson v. State*, 704 N.E.2d 1008, 1010 (Ind. 1998). That's true because it is often hard to discern the intent of the shooter. *Id.* But in Iowa we follow the "general rule" that "one who arms himself with the express purpose of shooting another cannot ordinarily claim the

---

[7] Yet the State appreciates that "this case bears some similarities to cases about transferred intent." We agree that concepts underlying the transferred intent doctrine are also at play here.

elements of" attempted murder are lacking. *Mong*, 988 N.W.2d at 314–15 (citation omitted). We also recognize "an intent to kill may be inferred from the use of a deadly weapon in a deadly manner." *State v. Mart*, 20 N.W.2d 63, 66 (Iowa 1945).

With those principles in mind, we believe that the jury could have inferred Yak's intent to kill D.M. or B.C. from evidence that he or his companions fired multiple shots directly into the house where Yak had just seen one of the boys come to the door. Juries must often rely on circumstantial evidence when determining a shooter's intent. *See State v. Clarke*, 475 N.W.2d 193, 197 (Iowa 1991); *see also State v. Brown*, No. 02-0086, 2003 WL 1967828, at *5 (Iowa Ct. App. Apr. 30, 2003) ("Although there is no direct evidence that Brown had the specific intent to kill or seriously injure another person, there is considerable circumstantial evidence from which a reasonable juror could find such intent."). And juries are free to view defendants "as intending the natural and probable consequences that ordinarily follow from their voluntary acts." *State v. LuCore*, 989 N.W.2d 209, 216 (Iowa Ct. App. 2023) (citation omitted).

Viewing all the evidence in the light most favorable to the verdicts, we believe the jury could reasonably infer from the State's evidence that Yak had the specific intent to cause one or both boys' deaths, to injure them or cause them fear, and to cause serious injury to D.M.

### B. *Batson* Challenge

Yak's last claim involves the *Batson* challenge he joined with his co-defendants. *See Batson*, 476 U.S. at 89 (holding the Equal Protection Clause forbids a prosecutor from challenging potential jurors solely based on the juror's race); *see also* U.S. Const. amend. XIV; Iowa Const. art. I, § 6. Because the case

was tried during the COVID-19 pandemic, jury selection of the sixty potential jurors in the jury pool occurred over two days with four smaller groups of fifteen questioned separately.  The State was allowed fifteen strikes, and each of the five co-defendants could exercise three strikes.  Yak confirmed that all five co-defendants were Black and all cooperated in the decisions involving each of their strikes.  Of the sixty potential jurors in the four pools, only two identified as "Black/African."  Of those two jurors, Juror 29 was in jury pool two and Juror 39 was in jury pool three.  As the jury selection wound down, the State exercised its last peremptory strike by removing one of the "Black/African" jurors: Juror 39.  Juror 29 remained and served on the jury.

The *Batson* objection, eventually joined by all co-defendants, followed the State's strike of Juror 39.  Once made, a *Batson* challenge requires a burden-shifting, three-step inquiry: (1) the challenging party, Yak, "must establish a prima facie case of purposeful racial discrimination in the peremptory strike" of Juror 39; "(2) the striking party [the State] must proffer a race-neutral explanation for the strike; and finally, (3) the challenging party [Yak] must carry the ultimate burden of proving purposeful discrimination."  *State v. Booker*, 989 N.W.2d 621, 627 (Iowa 2023).  We conduct a de novo review of the record when analyzing the *Batson* three-step inquiry, but at step three, because the district court evaluates an attorney's credibility over his or her true motives behind the strike, we give a great deal of deference to the district court's evaluation of that credibility.  *Id.*; *see also State v. Mootz*, 808 N.W.2d 207, 214 (Iowa 2012).  We also recognize that district court judges make juror disqualification rulings "on the spot and in real time."  *State v. Jonas*, 904 N.W.2d 566, 574 (Iowa 2017); *see also Mootz*, 808 N.W.2d at 225

("Voir dire is a very short window of time for attorneys and the court to determine whether a juror will be unbiased and impartial."). And because of those tensions, appellate courts should be resistant to second guessing the trial court's decisions on juror impartiality, which is influenced by many factors impossible to capture in a cold record. *Skilling v. United States*, 561 U.S. 358, 386–87 (2010).

Yet, *Booker* also informs us that "*Batson* necessarily requires a heavily context-specific inquiry, so although striking the sole Black juror does not, *in a vacuum*, establish a prima facie case, that fact in itself is relevant to the analysis and may be sufficient when viewed in context." 989 N.W.2d at 629. And while *Booker* dealt with the ramifications of striking the one Black juror on the panel and here there were two, we still treat the analysis with a similar focus. Thus, we turn to our review of the record made over the challenge, which was first framed by counsel for Owo Bol as:

> We have five defendants here, who are all—at least four of them are of African descent, or if not directly immigrated from Africa. And I believe a fifth who is African-American. As the Court knows, there has been increased scrutiny as it relates to racial issues related to a jury panel makeup. *I'm not raising a claim or real issue*, it's just the *Batson* challenge. I believe the circumstances of this case give us at least a prima facie *Batson* challenge here.

(Emphasis added.) Although all defendants joined in the motion, none offered further reasoning when asked to do so by the district court. Turning to the State's response to the tepid objection, the prosecutor countered without fully addressing the first step of the *Batson* inquiry:

> If the Court then believes [Owo Bol's counsel] made a prima facie case that we, in fact, engaged in a discriminatory pattern, then we would address the issue of whether or not there's a race-neutral reason to explain why, as tough as it was, we had to make the strike.

So I guess, if I'm reading the case correctly, and I'll defer to the Court's wisdom, I think he has to—the Court has to first find that he actually made a prima facie case, other than simply saying they struck someone because of—unless he's saying the only reason we struck her was because of her race, then he needs to be very clear on the record that that's what we did, and then we would respond accordingly.

With this invitation, the district court then asked for all defendants to expound upon the reasons each believed there was purposeful racial discrimination with the strike exercised by the State. Counsel for Owo Bol noted there was not much to add beyond the factors already articulated. But counsel for Dominguez developed a broader argument and explained that the strike came:

> based upon the opinions [Juror 39] shared in voir dire and her obvious desire to talk, to be vocal—she talked with every one of us, and she shared things about the fact that—about the fact that these were Black men, I do believe there's a prima facie case that some of the things she shared related to her opinions on race and her being Black are the reasons—make a prima facie case for the reasons the State stuck her.

In these arguments, Dominguez's counsel refers to her exchange with Juror 39, when defense counsel broached the subject of her client's race during the voir dire:

> DOMINGUEZ'S COUNSEL: The other thing that nobody wants to talk about is that these gentlemen are Black. That's hard for me to say with you in here, [Juror 39]; do you know why?
> JUROR 39: Why?
> DOMINGUEZ'S COUNSEL: Because I'm white and I don't know what it means to be Black.
> JUROR 39: It's hard.
> DOMINGUEZ'S COUNSEL: Thank you for saying that.

Noting this exchange during voir dire in the *Batson* challenge, Dominguez's counsel characterized Juror 39's reaction as a connection between the two of them:

> I identified the fact that these five gentlemen are Black, and [Juror 39] vocally said yes, and was visibly appreciative that someone said

that there are Black men accused here. And in my opinion, expressed her opinion that that needed to be talked about, that that was an issue.

The prosecutor picked up on counsel's characterization, noting:

I can interpret that as very supportive of [Dominguez's counsel], *if that's the way [Dominguez's counsel] wants to analyze the reaction*, because the reaction is not on the record. Go, you are the fighter for Black people. That's not—that's arguably me not doing my job if I don't have concerns that not only is she saying she's not— she has a difficulty with law enforcement in general, but more importantly, sharing the advocate and zealous defender of Black folks.

(Emphasis added.) In addition to the reasons articulated, defense counsel emphasized that there were only two Black jurors and it was significant that one was struck with the final strike by the prosecutor. The district court did not find the timing of the strike supported purposeful discrimination and observed that a juror of any race articulating a strong opinion or being outspoken generally likely would be struck because of those tendencies and not because of purposeful discrimination. As the district court noted, "If that was a white individual articulating the same type of things, or even articulating as strong an opinion on other things, that person would likely be struck because you don't want them—an individual may not want them on the jury because they're very outspoken generally."

In addressing the first step of the *Batson* challenge, the district court found that the co-defendants did not make a prima facie case for purposeful discrimination. Even so, where that ends the inquiry under the three-part *Batson* test, here, the district court moved to step two and asked for the State's reasoning behind the strike. But, because the prosecutor offered and the court considered race-neutral justifications for the strike, "the preliminary issue of whether [Yak]

ha[s] made a prima facie showing [is] moot." *See Mootz*, 808 N.W.2d at 218 (quoting *Hernandez v. New York*, 500 U.S. 352, 359 (1991)). We move to step two.

At step two, the State must articulate racially neutral reasons for the strike. *See Booker,* 989 N.W.2d at 629. In response to Yak's challenge, the prosecutor laid out reasons for the strike, which focused on Juror 39's comments that "she doesn't trust law enforcement" and that her attitude was a concern because there were going to be over eight law enforcement witnesses testifying. To support its concerns, the State draws our focus to the discussions that occurred during the examination of the third jury pool. The district court asked if anyone knew people from the list of witnesses; four people raised their hands indicating they personally knew a law enforcement witness. From that disclosure, the district court explored the officer's name and their specific relationship. Three described personal positive connections, and one explained the officer was investigating his son, possibly a negative association. After the prosecutor began his examination, he returned to some of those individuals specifically, and then this exchange occurred with Juror 39 about a question made to the full jury pool:

> PROSECUTOR: Anyone have—I see [another juror] knows a couple officers, so does [another juror]. Does anybody here have a bias *towards police officers*?
> JUROR 39: (Indicating.)
> PROSECUTOR: Thank you so much. That is what this—what we call jury selection—tell us, because we have a lot of police officers who are going to testify, and this is your opportunity, when you've been sworn in, and knowing that officers are going to be a lot of our witnesses, tell us your *bias towards officers*.
> JUROR 39: My bias all stems from the Central Park crowd,[8] like a lot of situations like that, where police officers are put into the

---

[8] As recounted in an article about the Central Park Five:

highest order and they take advantage of opportunity because others can't speak for themselves.

PROSECUTOR: And I don't mean to cut you, but there are rules we follow, and the Court and the rest of the lawyers know why I have to cut you. But I'm going to still stay with you. *I just want to make sure that this bias that you have, which is fair, it's a bias right now that you still hold on to?*

JUROR 39: *Yes.*

PROSECUTOR: *It's a bias that you believe would affect how you look at this case?*

JUROR 39: *If I'm being honest, kind of.*

PROSECUTOR: I want you to be honest because you have a right to be honest, and we will respect your position.

JUROR 39: Okay.

PROSECUTOR: You're not going to be judged for your position. It's just important that we all know your position. And I'm sure anybody else here wants to know your position and everybody else's position, which is why we put it out there. You were just brave and honest enough to tell us, so don't even hold back. *Tell me would that affect how you look at the testimony?*

JUROR 39: No, because I'm still going to listen to what they say, *but I'm going to be more attentive to what they say.*

PROSECUTOR: Bottom line is this, they are—we have several officers that we're going to be calling. The State of Iowa has to be assured that you are prepared—the State of Iowa and you will be fair to the defendants. So the question now is, can you truthfully, knowing all what you know and feel, can you be fair, honestly, to the State? Can you be fair to the State?

JUROR 39: Yes.

---

In 1989 [Korey Wise, Kevin Richardson, Raymond Santana, Antron McrCray, and Yusef Salaam]—then teenagers—were arrested in connection with the rape and assault of a white female jogger, and eventually convicted in a case that came to symbolize the stark injustices black and brown people experience within the legal system and in media coverage. They were convicted based partly on police-coerced confessions, and each spent between six and 13-plus years in prison for charges including attempted murder, rape and assault.

The men maintained their innocence throughout the case, trial and prison terms, and all were exonerated after Matias Reyes, a convicted murderer and serial rapist, confessed to the crime in 2002. In 2014, they were awarded a $41 million settlement, though the City of New York denied any wrongdoing.

Aisha Harris, *The Central Park Five: "We Were Just Baby Boys"*, N.Y. Times, May 30, 2019, https://www.nytimes.com/2019/05/30/arts/television/when-they-see-us.html.

PROSECUTOR: And can you be fair to the defendants?

JUROR 39: Yes.

PROSECUTOR: And as much as you have belief systems, so do a lot of people, but when you walk into this building, it is critical that you'll at least be fair to both sides and set aside and see that we simply do our jobs; can you do that?

JUROR 39: Yes, I can.

PROSECUTOR: Thank you. So right now are they guilty or not guilty?

JUROR 39: Not guilty.

PROSECUTOR: Why is that so?

JUROR 39: They haven't been proven guilty.

PROSECUTOR: If we do prove them guilty, can you find them guilty?

JUROR 39: Yeah.

PROSECUTOR: Without hesitation, if we do prove them guilty, and you along with others say they're guilty, would you—or is that going to be your hesitancy, I don't like police, I'm going to stick it to the Government?

JUROR 39: I wouldn't do that.

(Emphasis added.) From this exchange, the prosecutor later identified his concern over Juror 39's discussion with him, stating: "We contemplated, we did everything, we reviewed it, we thought about it. It was stressful, but I will not be doing my job if we left somebody who says, basically, I have an issue with police officers."

But in the final summary, the prosecutor based the State's decision on what he perceived as the juror's attitude toward police officers. And he was not alone in this perception because the district court referenced a similar reaction:

I understand that an issue as to the timing of the strike may be used as proof of purposeful discrimination. The Court first addresses whether—if there has been a prima facie case articulated in this case. The Court does not find that there has not been a prima facie case articulated in purposeful discrimination, and as such, the burden does not shift to the State; however, for purposes of arguendo, for purposes of the appellate record, the Court will address step two as under the analysis, as well, and that's whether the State can articulate a reason as to why this strike was made.

First and foremost, the Court finds the statements of counsel concerning the strike both credible and believable. The Court finds that the reasons that were provided by the counsel for the State, as

to striking this particular panel member, were both plausible and reasonable, and provide a legitimate ground for the counsel to form an opinion as to the prospective juror and why that prospective juror was objectionable.

Specifically, *the Court notes that this juror, without question, articulated an opinion as to law enforcement personnel.* As the State has argued, this case involves more than just one or two law enforcement personnel testifying. As I stated, the Court believes that this is a plausible and reasonable, legitimate ground for an opinion to strike this individual.

As such, the Court finds that, in this case, the defense has failed to establish that the counsel for the State was using a strike to engage in purposeful discrimination; as such, the Court will deny the motion.

(Emphasis added.)

At this second step, the district court "is extremely deferential to the party seeking to strike the juror." *Mootz*, 808 N.W.2d at 218. "Unless a discriminatory intent is inherent in the [attorney's] explanation, the reason offered will be deemed race neutral." *Hernandez*, 500 U.S. at 360 (noting that the prosecutor's perception the Latino persons struck from the jury would not accept the interpreter as the final arbiter of the witnesses' responses was a race-neutral reason and was not just to remove a certain race from the jury but to get jurors who would accept the interpreter's translation). "A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror." *Id.* A juror's bias against law enforcement has been found to be race neutral. *State v. Thomas*, 847 N.W.2d 438, 447 (Iowa 2014). And once a race-neutral reason is given, the district court is required to accept the reason and proceed to step three, where Yak had the burden to show the reason was "merely a pretext for discrimination." *See Mootz*, 808 N.W.2d at 219.

Now at step three, with the race-neutral reason formulated, the district court had to decide if it believed the prosecutor's explanation for striking the juror or if it was simply a pretext for racial discrimination. *Id.* at 219–20. In the end, the district court here accepted the reasons as race neutral—not using that term, but characterizing the reason for the strike as a legitimate, reasonable, and plausible ground. As stated in *Booker*, our cases have "have repeatedly noted that a juror's interactions with law enforcement and the legal system are . . . valid, race-neutral reason[s] for a peremptory challenge." 989 N.W.2d at 630 (alterations in original) (quoting *State v. Veal*, 930 N.W.2d 319, 334 (Iowa 2019)). And the explanation for the strike "'need not rise to the level justifying exercise of a challenge for cause' but must be race-neutral and 'related to the particular case to be tried.'" *Veal*, 930 N.W.2d at 334 (citation omitted).

Thus, the district court drilled down to the one point advocated by the prosecutor—the bias against police officers—that the district court observed and noted as well. The prosecutor emphasized:

> But *more importantly, Judge, she said she doesn't trust law enforcement, and nobody mentioned that.*
> So what she wants me to do is leave a juror, knowing that we have probably eight, nine, if not more law enforcement officers testifying, she made it abundantly clear, as it relates to her opinion, regarding law enforcement officers. If that's not a race-neutral reason to strike someone—I've been in courtrooms when other lawyers heard that and they recognized that was a race-neutral, from the totality of the circumstances.

(Emphasis added.) Oddly, no one challenged this race-neutral reason or protested it was not a legitimate reason to strike a juror. Specifically, Yak made no record of Juror 39's discussion of her feelings about law enforcement, if she had been

rehabilitated by other questions, or any concern that in the other juror pools potential jurors were not asked the same question.

Now on appeal, Yak maintains the record supports upholding the *Batson* challenge because the State's reasons for the strike were not race neutral. As Yak now frames the challenge, the reasons for the strike were not race neutral because the circumstances show the third of the four small juror groups was the only one that was asked a question about bias towards law enforcement, Juror 39 was treated differently because the prosecutor directly asked her that question, and asking a juror a question on this subject is "merely a proxy for race." Likewise, Yak also asserts the prosecutor's reason that Juror 39 "being supportive of defense counsel as a 'zealous defender of black folks'" was "explicitly about race."

On the last point, the discussion began because Dominguez's counsel inserted a comment about race in her question to Juror 39. Then when making a record about the *Batson* challenge, Dominguez's counsel described Juror 39 as being "appreciative" of their discussion. The State argues "[a]ny attorney should feel compelled to strike a juror who appears to be more favorable to another attorney in the case before the evidence has even been presented." And, it was defense counsel who identified observations of a favor by Juror 39 toward supporting the defendants. But even if this reasoning was closer to the line, the prosecutor identified a racially neutral explanation—Juror 39's bias against law enforcement—and the district court determined that the explanation was credible.

As for the other arguments advanced by Yak to attack the district court's ruling on the race-neutral reasoning, he directs us to points in the voir dire examination that he believes belie the race-neutral finding. First, Yak maintains

that questioning a Black juror about bias against law enforcement is "merely a proxy for race." But the question came only after several potential jurors identified a law enforcement witness they knew and after one mentioned the officer was investigating his son. It would be proper to explore those attitudes toward or against officers in a general sense at this point, and the question was directed to the group of fifteen jurors generally. "Skilled attorneys" often ask "a simple *factual* question where a prospective juror can be expected to give an honest answer in order to get at the prospective juror's *underlying outlook and beliefs.*" *Booker*, 989 N.W.2d at 635 (Mansfield, J., specially concurring). Juror 39 indicated a response to a general question, which is when the prosecutor asked her to "tell us your bias towards officers," and the specific questioning about bias began with Juror 39. And as in *Booker*, the prosecutor did not limit his concerns only to Juror 39; when another potential juror—who is not Black—made statements about bias against the State, the prosecutor requested the potential juror be removed for cause. *See* 989 N.W.2d at 631 (finding it persuasive, when considering whether the prosecutor's stated non-racial reason for use of a strike was pretextual, that the prosecutor did not limit his concerns about potential "victim blaming" solely to the Black juror who was struck).

Next, Yak contends it is suspicious that the question about law enforcement bias was only asked of the third group of jurors, which included a Black potential juror. The State maintains the reason was that this was the only group that had members who directly knew law enforcement witnesses. And, the second group of jurors contained the other Black potential juror, who did serve on the jury, but who was not asked any questions about bias towards law enforcement. This

factors into the overall circumstances we are to consider in evaluating the *Batson* challenge. *See id.* at 630 ("The ultimate inquiry is whether, under the totality of the circumstances, the strike was 'motivated in substantial part by discriminatory intent.'" (quoting *Flowers v. Mississippi*, 139 S. Ct. 2228, 2244 (2019)). The totality of the full voir dire examination does not support the suspicions of Yak.[9]

From a practical vantage point, we understand that "showing that a juror is actually biased poses difficult problems of proof." *State v. Webster*, 865 N.W.2d 223, 237 (Iowa 2015) (reflecting that voir dire is the method available to "smoke out" a juror's bias). Here, we have the cold record without the benefit of facial expressions or tone of the response. But we do have the credibility determination of the district court. *See Flowers*, 139 S. Ct. at 2244 ("[T]he best evidence of discriminatory intent often will be the demeanor of the attorney who exercises the challenge." (citation omitted)); *see also Veal*, 930 N.W.2d at 327 ("[A] great deal of deference is given to the district court's evaluation of credibility when determining the true motives of the attorney when making strikes." (citation omitted)). And it seems strange that neither Yak nor his co-defendants argued that the State misinterpreted Juror 39's attitude about law enforcement when they were there in real time. Perhaps the defendants understood the premise that "once the genie of prejudice or bias is out of the bottle, it is a fool's errand to put it back in through persistent coaxing." *Jonas*, 904 N.W.2d at 571 ("Under the actual-bias cases, a

---

[9] In the other three groups, although no potential juror indicated they knew law enforcement witnesses, the State explored potential jurors' bias towards the State or the criminal justice system in general and defense counsel asked about attitudes towards law enforcement in general as well. So, there was discussion about these topics in the other groups though not the exact same question.

later affirmative response to a 'magic question' using the words fair and impartial is not enough to rehabilitate the potential juror.").  And while there appeared to be some rehabilitation of Juror 39's position, we cannot say from our perch what demeanor each of the lawyers in the room and the judge observed as to her initial attitude, as opposed to during her later comments, solicited from the leading questions.  *See State v. Williams*, No. 21-1772, 2022 WL 16985147, at *4 (Iowa Ct. App. Nov. 17, 2022) ("The subtext, tone of voice, and demeanor of the jurors are relevant and not apparent from a transcript.").

We can only observe that at the time the *Batson* record was made both the prosecutor and the district court were under the impression that "without question" the juror expressed a "bias" (in the juror's own words) against law enforcement that would require her to be "more attentive" to their testimony over other witnesses.  And the need to be "more attentive" to testimony from police officers could be fairly interpreted to reflect Juror 39's stated concerns about law enforcement in general.  And, we have no record from Yak and his co-defendants arguing against that race-neutral reason, as they did not push back on that articulated concern raised by the State.

In sum, given the deference we are to afford the district court in its role to ascertain the true motive for the strike along with viewing the totality of the circumstances of this case, we do not find that the strike was "motivated in substantial part by discriminatory intent."  *Booker*, 989 N.W.2d at 630.  The district court did not abuse its broad discretion in overruling Yak's *Batson* challenge.  *See Jonas*, 904 N.W.2d at 571 ("The district court is vested with broad discretion in such rulings.").

Because substantial evidence supports each of Yak's convictions, and because our de novo review does not lead us to a different result on the *Batson* issue, we affirm.

**AFFIRMED.**

Bower, C.J., concurs; Tabor, J., partially dissents.

**TABOR, Judge.** (concurring in part and dissenting in part)

I concur in the majority's substantial-evidence analysis. But I respectfully dissent on the *Batson*[10] issue. "Equal justice under law requires a criminal trial free of racial discrimination in the jury selection process." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2242 (2019). Yak's trial did not meet that test.

First, Yak established a prima facie case of purposeful racial discrimination in the State's peremptory strike of Juror 39, one of only two Black citizens in the jury pool.[11] Second, the prosecutor's reasons for the strike were not race neutral. And third, even if the reasons were race neutral, Yak carried his burden to show that they were a pretext for racial discrimination. *See State v. Booker*, 989 N.W.2d 621, 629 (Iowa 2023).

The district court was dubious of the *Batson* challenge from the start. Without prompting from the prosecution, it questioned whether the defendants made a prima facie case, noting "just because they struck a Black juror does not necessarily mean that it was purposeful discrimination." Counsel for Dominguez agreed with the court's premise but explained why striking Juror 39 appeared to be about race:

> [B]ased upon the opinions she shared in voir dire and her obvious desire to talk, to be vocal—she talked with every one of us, and she shared things about the fact that—about the fact that these were black men, I do believe there's a prima facie case that some of the things she shared related to her opinions on race and her being black

---

[10] *See Batson v. Kentucky*, 476 U.S. 79 (1986).
[11] Both Yak and the State suggest that we may bypass this step as moot because the court asked the State to provide race-neutral reasons. *See State v. Mootz*, 808 N.W.2d 207, 215 (Iowa 2012). But because I disagree that the State's proffered reasons for the strike were race neutral, it completes the analysis to address the first step.

are the reasons—make a prima facie case for the reasons the State struck her.

The court rejected that explanation, saying it had "a hard time extrapolating or connecting" Juror 39's "being vocal" with a finding of purposeful discrimination. The court then seemed to offer its own race-neutral reason for the State's strike, comparing Juror 39 to a hypothetical opinionated white juror. "If that was a white individual articulating the same type of things, or even articulating as strong an opinion on other things, that person would likely be struck because you don't want them—an individual may not want them on the jury because they're very outspoken generally."

Contrary to the district court's finding, Yak did present a prima facie case of purposeful discrimination.[12] This first step is not intended "to be so onerous that a defendant would have to persuade the judge—on the basis of all the facts, some of which are impossible for the defendant to know with certainty—that the challenge was more likely than not the product of purposeful discrimination." *Johnson v. California*, 545 U.S. 162, 170 (2005). Instead, evidence is sufficient if the court can "draw an inference that discrimination has occurred." *Id.*

Yak cleared that low bar to show an inference of purposeful discrimination. As Yak notes on appeal, "Juror 39's group was the *only group* that the State asked, 'Does anybody here have a bias towards police officers?'" The State counters that the examination of Juror 39's group was the one time that several panelists said

---

[12] Courts may consider all relevant circumstances in deciding whether the objector makes a prima facie case. *See Batson*, 476 U.S. at 97. Examples of relevant circumstances include a pattern of strikes against Black jurors and the prosecutor's questions and statements during jury selection. *Id.*

they knew police officers who would be testifying. The State also points to the prosecutor's phrasing—asking if anyone had a bias *towards* police, not *against* police. But that word choice was lost on Juror 39, who took "bias" to mean skepticism of police conduct. When Juror 39 raised her hand in response to the prosecutor's inquiry, he probed her view of police officers and her ability to be fair. In contrast, the prosecutor did not ask the same probing questions of white prospective jurors who confirmed that they knew police officers who might be witnesses, suggesting that he was not trying to ferret out panelists who were biased *towards* law enforcement.[13] What's more, when the prosecutor used his last peremptory strike on Juror 39, he eliminated fifty percent of the available Black jurors. It's true that statistics alone do not give rise to an inference of purposeful discrimination. But numbers are relevant. *See Flowers*, 139 S. Ct. at 2245; *see also Booker*, 989 N.W.2d at 629 ("[A]though striking the sole Black juror does not, *in a vacuum*, establish a prima facie case, that fact is relevant to the analysis . . . ."). Considering all relevant circumstances, the record supports an inference of purposeful discrimination.

Moving to the second *Batson* step, while the court did not find that the burden had shifted, it still asked the State to articulate the justification for its strike. Before articulating his reasons for striking Juror 39, the prosecutor complained that the defense attorneys did not give him credit for leaving a Black person on the jury:

---

[13] In fact, two panelists (Jurors 35 and 43) conveyed that they knew one of the police officers listed as a possible State's witness, and a third panelist (Juror 19) was married to a police detective. The prosecutor did not probe their potential biases. That third juror did assure defense counsel that he would not "believe the police officer just because they're a police officer." All three of those panelists ended up serving on the jury.

> We're not shying away from the issue, but too often we throw things out there and people's credibility are on the line. What I didn't see any one of them do is stand up and tell this Court what we did: left an African-American on the jury, to say, whoa, they left an African-American on the jury, but the moment we struck one, this insinuation/suggestion that it was because of her race.

But leaving one of two Black jurors on the panel did not shield the State from a *Batson* challenge. *See Miller-El v. Dretke*, 545 U.S. 231, 250 (2005) (skeptically viewing State's decision to accept one Black juror as attempt to obscure pattern of opposition to seating Black jurors); *see also Batson*, 476 U.S. at 95 ("'A single invidiously discriminatory governmental act' is not 'immunized by the absence of such discrimination in the making of other comparable decisions.'" (citation omitted)).

The prosecutor then asserted that he struck Juror 39 because "she said she doesn't trust law enforcement, and nobody mentioned that." The prosecutor claimed that Juror 39's opinion on law enforcement officers was "abundantly clear."[14] But the prosecutor mischaracterized the juror's responses.

---

[14] The prosecutor also called out one of the defense attorneys for "feeling it was important to accuse the Government of engaging in purposeful discrimination." Another defense counsel responded that "the allegations from the State that this is a personal issue versus a constitutional issue are ridiculous." Defense counsel's point is an important one.

> [U]nder *Batson*, the issue is not racial animus but the respondent's right to a fair trial, including a jury selection process untainted by improper exclusion of prospective jurors based on race. The State, like any other party to a jury trial, wants to seat a jury that will be favorable (or at least not hostile) to its case. *Batson* focuses on the *reason* the State believes a particular juror should not be seated, and if the juror's race is the reason, a violation exists despite the fact that the prosecutor does not otherwise discriminate against or harbor any animus toward that race.

*In re A.S.,* 76 N.E.3d 786, 793 (Ill. App. Ct. 2017); *see Harris v. United States*, 260 A.3d 663, 669 (D.C. 2021) ("[R]ace is an impermissible factor in jury selection even if (as we assume here) the prosecutor was not motivated by racial animus, but

As the majority notes, Juror 39 raised her hand when the prosecutor asked members of the fourth venire panel whether anybody had "a bias towards police officers." In detailing the juror's exchange with the prosecutor, the majority italicizes what it believes are the key passages. But the majority's emphasis overlooks the tempering statements interspersed in the juror's responses. For example, Juror 39 did not recount any negative personal knowledge or experiences with police in the community. Instead, she mentioned an infamous rape case from New York City in which detectives used improper tactics to coerce false confessions from Black teenagers over thirty years ago.[15] The prosecutor encouraged her to discuss her "bias towards officers," and she answered honestly.

Contrary to the prosecutor's recollection, Juror 39 did not say she did not trust law enforcement. Rather, she was concerned by situations when officers exploit their authority over "others who can't speak for themselves." The prosecutor told her it was "fair" to hold that opinion, she had "a right to be honest," and he would respect her position. Further stretching sincerity, he said: "You're not going to be judged for your position." The prosecutor described her as "brave" and told her: "[D]on't even hold back." When asked how her "bias" would affect

---

instead acted on an assumption that a black woman juror, because of her race, would be favorable to a black defendant or unfavorable to the government."); *see also People v. Ojeda*, 487 P.3d 1117, 1132 (Colo. App. 2019) (Harris, J., specially concurring) ("A defendant need not show that the race-based strike was motivated by the lawyer's prejudice or animus."), *aff'd on other grounds*, 503 P.3d 856 (Colo. 2022).

[15] This case returned to the public eye in 2019 when Netflix aired *When They See Us*, a hit miniseries based on the true story. *See* Elizabeth Vulaj, *From the Central Park 5 to the Exonerated 5: Can It Happen Again?*, 91 N.Y. ST. B.J. 24, 24 (August 2019) (noting miniseries "reignited a national conversation about race, our criminal justice system, and the role of police, prosecutors and the press in the treatment and depiction of these men").

how she viewed the officers' testimony, she assured the prosecutor that she would "listen to what they say." She added that she would "be more attentive to what they say." But being "more attentive" is not the same as saying she would disbelieve them. In fact, when asked if she could be fair to the State, she answered "yes." And when the prosecutor questioned whether she would hesitate to return a guilty verdict if the State proved its case, just to "stick it to the government" because she didn't like police, she said: "I wouldn't do that." Seemingly satisfied with her response, the prosecutor said: "And that's all we are asking for are fair people and honest people." In this exchange, the prosecutor uttered inflammatory language, which Juror 39 disavowed. So for the prosecutor to later say her distrust of police was "abundantly clear" was an exaggeration.

Overlooking that nuance, the majority characterizes Juror 39's "bias against police officers" as the "one point advocated by the prosecutor" for striking her.[16] And it questions the defense preservation of error, finding it "odd" that "no one challenged this race-neutral reason or protested that it was not a legitimate reason to strike a juror." Yet the State concedes that Yak preserved his *Batson* challenge by raising it before the jury panel was dismissed and receiving an adverse ruling. Plus, a review of the record reveals that the district court did not welcome in-depth

---

[16] The majority mentions that the prosecution asked to remove for cause another potential juror—who was not Black—after he suggested that he could not be fair to the State. But that same venire member, Juror 17, also said that "the defendant's attorney is basically the devil's advocate." The court later struck Juror 17, finding that he was giving answers "in attempt to get off the jury and has not necessarily been truthful." The prosecution's treatment of that potential juror was not a useful comparison to its peremptory strike against Juror 39.

rebuttals to the State's explanation for its strike, repeatedly telling defense counsel to "be brief" because they were "running out of time."

The record also shows that Juror 39's alleged distrust of the police was not the prosecutor's sole reason for striking her. After asserting that Juror 39 "had an issue with law enforcement officers," the prosecutor offered a second—and what he called "more important"—reason for his strike: Juror 39's expression of gratitude when counsel for Dominguez acknowledged the race of the five co-defendants during jury selection.

> DOMINGUEZ'S COUNSEL: The other thing that nobody wants to talk about is that these gentlemen are black. That's hard for me to say with you in here, [Juror 39]; do you know why?
> JUROR 39: Why?
> DOMINGUEZ'S COUNSEL: Because I'm white and I don't know what it means to be black.
> JUROR 39: It's hard.
> DOMINGUEZ'S COUNSEL: Thank you for saying that.

Later in arguing the *Batson* motion, Dominquez's counsel confirmed that Juror 39 "vocally said yes, and was visibly appreciative that someone said that there are Black men accused here."[17]

Recalling that exchange, the prosecutor was at first dismissive of the juror's reaction, saying; "It's obvious to anybody who was not blind that the defendants were Black, so giving credit to . . . a juror, who said, guess what? The defendants are Black. Thank you for telling us what is obvious." Then in his later remarks the prosecutor couched the reason for his strike in race-based language, suggesting

---

[17] On that point, the majority finds it significant that it was Dominguez's attorney who broached the topic of race with Juror 39. Granted, the defense pointed to the elephant in the room. But that opening did not excuse the prosecution from offering a race-neutral reason for its peremptory strike.

that Juror 39 was essentially cheering on Dominguez's counsel: "Go, you are the fighter for Black people." The prosecutor drew this juxtaposition: "[S]he has a difficulty with law enforcement in general, but more importantly, sharing the advocate and zealous defender of Black folks."

But the prosecutor put those words into her mouth. Juror 39 did not say that she sided with the defense as the "zealous defender of Black folks."[18] *See State v. Cook*, 312 P.3d 653, 655 (Wash. Ct. App. 2013) (ruling that concern by prosecutor that defense counsel, who was Black, made a connection with a Black juror, allegedly calling him "brother," was not a race-neutral reason to strike that juror). Viewed in context, the prosecutor's second reason was not race neutral; it was infused with racial overtones. The prosecutor's justification for excluding Juror 39 was a pretext for a racially motivated strike. *See Mootz*, 808 N.W.2d at 218 (noting that not until step three does the persuasiveness of the justification become relevant).

The majority acknowledges that this second line of reasoning offered by the prosecutor comes "closer to the line" of purposeful discrimination based on Juror 39's race. But the majority falls back on the prosecutor's statement that the juror had "bias against law enforcement" to find the strike was race neutral.

In cases like this, where the prosecutor gives more than one justification for a peremptory strike, courts assessing race neutrality have followed three approaches: (1) the per se approach; (2) a mixed-motive approach; and (3) the substantial-motivating-factor approach. *See Ojeda*, 487 P.3d at 1122. Under the

---

[18] At most, in response to defense counsel's prompting, Juror 39 expressed that it was "hard" to be a Black person.

per se approach, a racially discriminatory peremptory strike violating *Batson* cannot be saved because the strike's proponent offers another nondiscriminatory reason. *See Payton v. Kearse*, 495 S.E.2d 205, 210 (S.C. 1998) ("Once a discriminatory reason has been uncovered—either inherent or pretextual—this reason taints the entire jury selection procedure."). Under the mixed-motive approach, once the challenger has shown a discriminatory motivation for the strike, the proponents can still prevail by proving they would have taken the same action absent that improper motivation. *Ojeda*, 487 P.3d at 1122. Finally, under the substantial-motivating-factor approach, courts ask whether the prosecutor was motivated in substantial part by discriminatory intent. *See Cook v. LaMarque*, 593 F.3d 810, 815 (9th Cir. 2010).

Our supreme court has not addressed which of these approaches is proper when the prosecutor has offered more than one reason in response to a *Batson* challenge. To fill that void, I believe we should adopt the per se approach, which "is the most faithful to the principles outlined in *Batson*." *See Ojeda*, 487 P.3d at 1122; *see also Wilkerson v. Texas*, 493 U.S. 924, 928 (1989) (mem.) (Marshall, J., dissenting) ("I would find that this Court's requirement that a prosecutor provide a 'neutral' explanation for challenging an Afro-American juror means just what it says—that the explanation must not be tainted by *any* impermissible factors. Requiring anything less undermines an already underprotective means of safeguarding the integrity of the criminal jury selection process."); *State v. Lucas*, 18 P.3d 160, 163 (Ariz. Ct. App. 2001) ("Regardless of how many other nondiscriminatory factors are considered, any consideration of a discriminatory factor directly conflicts with the purpose of *Batson* and taints the entire jury

selection process."). But even if we follow the substantial-motivating-factor approach, the prosecutor's justification for striking Juror 39 was not race neutral.

After hearing the State's reasons for striking Juror 39, the district court declared them "both credible and believable." The court added:

> [T]his juror without question articulated an opinion as to law enforcement personnel. As the State has argued, this case involves more than just one or two law enforcement personnel testifying. As I stated, the Court believes that this is a plausible and reasonable, legitimate ground for an opinion to strike this individual.

What the court did not say was that the prosecutor's reasons were race neutral. The majority maintains the district court did so without using that term. But race-neutral reasons are the key to overcoming a *Batson* challenge. The prosecutor's reason for finding a prospective juror objectionable must be unbiased. Because the district court did not make that explicit finding, less deference is due to its rejection of the *Batson* challenge. *See Harris*, 260 A.3d at 674 (stressing the need for "a rigorous evaluation of the credibility of the prosecutor's explanations" (citation omitted)).

Still, the majority accepts the district court's bare-bones reference to finding the prosecutor's statements to be credible, noting that on appeal we have only a "cold record without the benefit of facial expressions or tone of the response." It's true that we can't see what the trial judge saw or hear what the trial judge heard. But the trial judge did not record his observations. As an experienced federal judge has written—it is troubling for appellate courts to rely on a juror's "demeanor and body language" as supporting the "race-neutral" reason for a peremptory strike, often "without requiring the trial court to develop or evaluate the factual basis for the 'demeanor' objection, thus apparently taking the [prosecutor's] explanation as

credible on its face." Judge Mark W. Bennett, *Unraveling the Gordian Knot of Implicit Bias in Jury Selection: The Problems of Judge-Dominated Voir Dire, the Failed Promise of* Batson*, and Proposed Solutions*, 4 Harv. L. & Pol'y Rev. 149, 164 (2010).

The majority also deems it "strange" that the defense did not argue that the prosecutor "misinterpreted Juror 39's attitude about law enforcement when they were there in real time." It then speculates that perhaps the defendants understood the premise that once a potential juror expresses bias, it is hard to rehabilitate her, citing *State v. Jonas*, 904 N.W.2d 566, 571 (Iowa 2017). But the majority mixes apples and oranges. *Jonas* is about disqualifying a juror for cause based on his expression of bias against gay people. *Id.* Here, the question is the discriminatory intent of the prosecutor in striking a Black juror based on her race. And unlike the judge in *State v. Williams*, No. 21-1772, 2022 WL 16985147, at *4 (Iowa Ct. App. Nov. 17, 2022), the court here did not offer any observations about Juror 39's demeanor that would support the prosecutor's rationale that she was hostile to law enforcement.

The State and the majority cite *Booker* for the proposition that our cases "have repeatedly noted that a juror's interactions with law enforcement and the legal system are [a] valid, race-neutral reason[] for a peremptory challenge." *See* 989 N.W.2d at 630. In *Booker*, the State's justification focused on the juror's familiarity with "a very similar set of circumstances" and how it "might shape his perspective of this particular case." *Id.* But that is not what happened here. Juror 39 did not recount any personal negative experiences with the police. Rather, at the urging of the prosecutor, she articulated her general bias stemming

from a high-profile case in which police officers abused their authority. As Yak argues on appeal, "[i]t's no secret that African Americans generally hold more negative views about police than Whites based on law enforcement's lengthy history of abusive and sometimes deadly encounters with African Americans." The State does not dispute that supposition. But it insists the prosecution "is not required to accept jurors who openly state that they have a bias that will affect how they view the evidence, even if similar biases are more common among certain racial groups." Trouble is, Juror 39 did not openly state that her bias would affect how she would view the evidence. In fact, she assured the prosecutor that she could be fair to both sides.

On this record, pointing to the juror's views on law enforcement was not a race-neutral reason for the peremptory strike. Rather, it underscored the race-based implications in the prosecutor's baiting of Juror 39 to expound on her bias involving law enforcement after her mention of the Central Park Five. *See generally Booker*, 989 N.W.2d at 635 (Mansfield, J., specially concurring) (embracing *Cooper v. State*, 432 P.3d 202, 206 (Nev. 2018), which voiced concern that questioning would-be juror's support for social justice movements had "indisputable racial undertones")).

And even if Juror 39's skepticism of law enforcement had come from personal experience, it is high time for Iowa's courts to stop accepting such all-too-common negative interactions with police as carte blanche race-neutral reasons for removing Black citizens from juries. A noted jurist captured the injustice of this reasoning:

The fact that these everyday experiences of Black Americans are considered legitimate grounds for a peremptory strike—even when a juror unequivocally says she will be fair and follow the law, and even when there is no basis to remove the juror for cause—goes a long way to explaining why *Batson* "has been roundly criticized as ineffectual in addressing the discriminatory use of peremptory challenges during jury selection." It may also help explain why a substantial majority of Americans believe the criminal justice system treats Blacks less fairly than whites.

No great sociological inquiry is needed to understand the problematic nature of the strike at issue here. Countless studies show that Black Americans are disproportionately subject to police and court intervention, even when they are no more likely than whites to commit offenses warranting such coercive action.

*People v. Triplett*, 267 Cal. Rptr. 3d 675, 688–89 (Cal. Ct. App. 2020) (Liu, J., dissenting) (internal citations omitted). "As it stands, our case law rewards parties who excuse minority jurors based on ostensibly race-neutral justifications that mirror the racial fault lines in society." *Id.* at 692. This case presents an opportunity to recognize that a minority juror's negative perception of law enforcement is not alone a race-neutral reason to exercise a peremptory strike. *See State v. Miller*, No. 16-0331, 2017 WL 1088104, at *3 (Iowa Ct. App. Mar. 22, 2017) ("While using potential jurors' response about law enforcement appears to be race-neutral, it is likely to have a disparate impact on potential black jurors.").

So, finally, step three of the *Batson* inquiry. Even if the majority were correct in finding the prosecutor's reasons to be race neutral, that does not end the inquiry. We must decide whether to believe the prosecutor's explanation or decide that the reasons were "merely pretext for racial discrimination." *See Booker*, 989 N.W.2d at 630. Bottom line, we ask whether the State's peremptory strike of Juror 39 "was 'motivated in substantial part by discriminatory intent'" under the totality of circumstances. *See id.* (quoting *Flowers*, 139 S. Ct. at 2244). "Although a neutral

explanation is one based on something other than the race of the juror and need not rise to the level justifying a challenge for cause, the neutrality of that explanation must be viewed in the totality of the prosecutor's comments." *See Cook*, 312 P.3d at 657.

The prosecutor's comments during jury selection support a finding of discrimination. After Juror 57, who was white, told the court that he did not believe in putting people in jail, the prosecutor berated him for being unwilling to do his civic duty. After a protracted discourse on sacrifice and the rule of law, the prosecutor singled out Juror 57: "I'm not going to stand up here and lecture you. For the rest of you, other than . . . the gentleman who's made up his mind, I believe you can be fair, just, which is all we ask. So for the rest of you, I say thank you."

When it was defense counsel's turn, she told Juror 57 that he was "really brave," and that she disagreed with the prosecutor: "I think we need people like you to say the truth in how they're feeling." After Juror 57 said he didn't "want to be responsible for putting five young men in jail or not in jail," counsel for Dominguez discussed the presumption of innocence and implicit bias. Counsel described the temptation to believe the defendants were guilty before the State presented evidence: "They're here. They're charged. They have attorneys. They're Black. Their faces were on the news. They were wearing stripes. Aren't they guilty?" The prosecutor then revealed his discomfort with defense counsel's reference to race, objecting to the phrase "that they're Black." The court asked defense counsel to rephrase her question to Juror 57. But after all of that, the prosecutor did not use a peremptory strike on Juror 57. "Comparing prospective

jurors who were struck and not struck can be an important step in determining whether a *Batson* violation occurred." *Flowers*, 139 S. Ct. at 2248.

In arguing the *Batson* challenge, counsel for Dominguez pointed to the prosecutor's decision not to strike Juror 57 "when he expressed similar views" as Juror 39. "That, Your Honor, should be telling to this Court about the intentions."

Defense counsel continued:

I do not believe [Juror 57] was treated with dignity and respect by the State. And I believe that the manner in which the State handled voir dire was inappropriate, and the manner in which [Juror 57] was treated versus that Black young lady should be evidence for this Court, and for the appellate court, that [the prosecutor's] treatment of individuals who voiced concerns about law enforcement and not wanting people to go to jail is not unbiased.

When evaluating discriminatory intent, we may also consider "that the prosecutor misstated the record (whether intentionally or not) in defending against the *Batson* challenge." *See Booker*, 989 N.W.2d at 631. As discussed, the prosecutor overstated Juror 39's distrust of police and embellished her praise for defense counsel's advocacy. After reviewing jury selection in its totality, I would find that the State's peremptory strike of Juror 39 was substantially motivated by her race.

The Equal Protection Clause forbids striking even one prospective juror for a discriminatory purpose. *See Snyder v. Louisiana*, 552 U.S. 472, 478 (2008). And the damage from this discriminatory jury selection extends beyond Yak. *See Batson*, 476 U.S. at 87 ("Racial discrimination in selection of jurors harms not only the accused whose life or liberty they are summoned to try."). Denying participation in jury service on account of race unconstitutionally discriminates against the excluded juror too. *Id.* And beyond the harm to Yak and Juror 39,

"[s]election procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice." *Id.* Finding a constitutional violation, I would reverse and remand for a new trial.